June 17, 2026

**_E-Filed_**

The Honorable Robert M. Illman
United States District Court for the Northern District of California
Eureka-McKinleyville Courthouse
3140 Boeing Ave.
McKinleyville, CA 95519

> **Re:**   **_In re Salesforce LLM Copyright Infringement Litigation_,**
> **Master Case No. 3:25-cv-08862-CRB**

Dear Judge Illman:

Pursuant to this Court's standing order, the parties submit this letter brief regarding Plaintiffs' request for additional custodians pursuant to the ESI Protocol. ECF No. 48. Lead counsel for the parties met and conferred on June 5 and on June 12, 2026, but were unable to resolve their dispute.

Plaintiffs respectfully request a hearing on this dispute. Plaintiffs are available to appear in-person. While Defendant does not believe this dispute warrants or needs a hearing, it is also available to appear in-person or remotely if the Court believes a hearing would be beneficial.

**PLAINTIFFS' STATEMENT**

Plaintiffs seek to compel the addition of seven document custodians, all of whom possess relevant and non-duplicative information. This class action concerns Salesforce's acts of piracy. Salesforce copied hundreds of thousands of copyrighted books contained in the Books3 dataset, which Salesforce downloaded, stored, and used to develop its XGen and CodeGen series of large language models ("LLMs"), which in turn power Salesforce's commercial products, including Agentforce. FACC ¶¶ 38, 40, 48. Why, how, and with whose approval Salesforce identified, copied, and used pirated books to develop its LLMs goes at least to liability, damages, and fair use. So does the issue of whether Salesforce knew that these datasets contained pirated material but used them anyways without permission. Plaintiffs' request aligns with the number of custodians granted in similarly complex generative AI copyright cases. *E.g.*, *Tremblay v. OpenAI, Inc.*, 2024 WL 3638421, at *1 (N.D. Cal. July 31, 2024) (Illman, J.) (24 custodians); *Nazemian, et al. v. NVIDIA Corp.*, No. 24-cv-01454-JST, ECF No. 98 (N.D. Cal. Jan. 1, 2025) (24 custodians).

Salesforce has agreed to eight document custodians, limited to AI researchers largely focused on the development of its LLMs, as well as only one product director. Plaintiffs' request for seven additional custodians is reasonable and proportional to the needs of this case,[1] which concerns the alleged piracy of hundreds of thousands of copyrighted works by one of the largest corporations in the world. As detailed below, the proposed custodians cover knowledge gaps on core topics. Far from a "fishing expedition," Plaintiffs have substantiated their requests through public articles, Salesforce's website, and the proposed custodians' own descriptions of their work.[2] Though Salesforce attempts to minimize the evidence Plaintiffs muster, courts have granted requests to add custodians based on public sources. *E.g.*, *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2021 WL 10282213, at *12 (N.D. Cal. Nov. 14, 2021) (considering publicly available information in the designation of custodians). Further, "[t]hat some responsive documents will necessarily be found in other custodians' records is not sufficient to defeat a search of a custodian's files." *Andersen v. Stability AI Ltd.*, 2026 WL 1257935, at *3 (N.D. Cal. May 7, 2026) (cleaned up). Plaintiffs show ample reason to designate these seven custodians.

**1. *Marc Benioff***, Salesforce's founder, CEO, and Chair of its Board of Directors, has unique knowledge of Salesforce's integration of its LLMs into its product offerings, including whether their development violated copyright law, as evident from his many public statements. *See, e.g.*, FACC ¶ 66 (Benioff: "There's a pretty great company to be built on a standardized set of training data that lets all these companies play a fair . . . game and let the content creators . . . get paid fairly for their work. And I think that bridge has not yet been crossed. And that's a mistake by the AI companies."); *Salesforce CEO Marc Benioff says AI models have 'stolen' copyrighted content from media companies* ("We're not scraping the internet with our models"). These statements were made in his role as CEO of Salesforce, about Salesforce's conduct—they are not solely observations about other companies, as Salesforce contends. Further, Benioff—as CEO—likely has some of the most relevant evidence regarding Salesforce's commercialization of the models—

---

[1] Plaintiffs met and conferred with Salesforce to designate eleven additional custodians. Salesforce agreed to designate one of these. Plaintiffs omit three others from this brief because Plaintiffs are unable to present argument for all ten in two and a half pages, in accordance with the Court's Standing Order. Plaintiffs reserve all rights to seek additional custodians at a later date.

[2] Salesforce omits that the purported 2,500 search terms refer to disaggregated terms included in only 16 search strings the parties are negotiating. This is a mischaracterization.

essential to challenging its fair use defense. *See Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006).

**2. *Steve Fisher*** is President and Chief Product Officer and the former CTO. He has knowledge of products that incorporate Salesforce's LLMs developed with pirated books—information essential to understanding how Salesforce profited from its alleged conduct. He has publicly commented on AI training, stating, "AI is only as good as the data that it has," suggesting he has information about Salesforce's decision to target copyrighted books. *How Salesforce's Data Cloud Drives the Next Generation of AI-Powered Enterprise Apps – Salesforce*. He was also part of a group called "AI at Salesforce" with Benioff and other executives, which focused on integrating AI into Salesforce's business. *See Salesforce Is Building an AI That Watches You – and Acts for You*. How Salesforce integrated the at-issue LLMs into its products is directly relevant to Salesforce's commercial purpose, damages, and the fair use factors, including market dilution. That this may concern only prospective actions is of little import—after all, Factor 4 examines potential effects on the market. 17 U.S.C. § 107(4).

**3. *Srini Tallapragada*** is President & Chief Engineering and Customer Success Officer. He is the key node between the engineering and executive teams—absent from the agreed-upon custodians. In 2023, when the XGen models were first publicly released, he spoke at Salesforces' annual conference to highlight that "AI requires data[,]" explaining the key challenge facing developers (and Salesforce). He also addressed training data compliance, stating "AI . . . needs to be integrated . . . in a trusted way." https://www.youtube.com/watch?v=KmaNLOyytlY (at 4:00–5:00). These public statements, as well as his role, indicate specific knowledge about Salesforce's development of its LLMs and policies regarding the same.

**4. *Jayesh Govindarajan*** is Executive VP of Salesforce AI, where he directs strategy for designing, building, and operating Salesforce's generative AI systems. He has unique knowledge of how and why Salesforce targeted pirated books for its AI models and how its LLMs were integrated into its enterprise products. Govindarajan possesses non-duplicative documents as a VP and a data/engineering expert, bridging the gap between Salesforce's business strategy and those with technical knowledge.

Salesforce categorically claims that there is no knowledge gap that necessitates the inclusion of Benioff, Fisher, Tallapragada, and Govindarajan as custodians. But, as explained, these custodians each had a unique role to play in Salesforce's AI endeavors. They are likely to possess relevant and unique communications with key executives and direct reports. And it is simply not credible that Salesforce's key decision makers would not have knowledge of the company's acts of mass piracy. *See Tremblay*, 2024 WL 4512055, at *2 (N.D. Cal. Oct. 16, 2024) (Illman, J.) (designating OpenAI's COO, a "key decision-maker," as custodian); *Kadrey, et al. v. Meta Platforms, Inc.*, No. 3:23-cv-03417-VC-TSH, ECF No. 212 (N.D. Cal. Oct. 4, 2024) (designating Meta's CEO as custodian in AI copyright case); *Facebook*, 2021 WL 10282213, at *12 (designating, in addition to the existing 81 custodians, Facebook's CEO and COO as custodians likely to possess non-duplicative, relevant information).

**5. *Tuhin Chakrabarty*** has unique knowledge of Salesforce's use of copyrighted books. Unlike the agreed-to custodians whose knowledge focuses on the development of Salesforce's LLMs, his research addresses the ability of LLMs to reproduce verbatim up to 90% of copyrighted books used in training. His research also examines issues relating to fair use Factor 4 (effect on the potential market), such as whether readers prefer the output of LLMs trained on copyrighted books

2

over human writers. *See* https://arxiv.org/abs/2603.20957. Chakrabarty's testing of Salesforce's LLMs, including whether they can output copyrighted materials, and their ability to mimic authors, is clearly relevant. Salesforce's claim that Chakrabarty's research is not tied to Salesforce is belied by common sense—he has been at Salesforce since 2024, and published his research with *other agreed-to custodians*. *See, e.g.*, https://arxiv.org/abs/2309.14556.

**6.** *Vivek Mahapatra* is VP of AI Product and a founder of Agentforce, the platform through which Salesforce makes its AI tools and LLMs available to customers. Plaintiffs alleged that the XGen and CodeGen series of LLMs were developed using Plaintiffs' copyrighted books. FACC ¶¶ 7– 11. And the XGen and CodeGen LLMs are alleged to power Agentforce. *Id.* ¶ 48. Because Mahapatra led Agentforce product strategy, he possesses non-duplicative documents regarding the commercialization of the LLMs at-issue, relevant to fair use Factor 1. That Salesforce has designated one custodian from product is no reason to deny the designation of another with different and more direct responsibility regarding Agentforce. *See Andersen*, 2026 WL 1257935, at *3.

**7.** *Kathy Baxter* develops policy and guidelines on AI at Salesforce. She has written numerous articles about obtaining consent to use data and has addressed LLMs built on copyrighted content. *See Generative AI: 5 Guidelines for Responsible Development – Salesforce*. She publicly claimed that Salesforce "never" uses copyrighted data in its LLMs—a claim Plaintiffs seek to verify. *See Salesforce CEO Marc Benioff says AI models have 'stolen' copyrighted content from media companies*. Salesforce's policies related to copyright are relevant to willfulness and damages. *See Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017). Her statements indicate unique knowledge not covered by any of the other custodians.

## DEFENDANT'S STATEMENT

Plaintiffs allege a single claim of copyright infringement, focused on whether Salesforce used a handful of datasets that allegedly contain Plaintiff's copyrighted works to train a discrete set of LLMs.[3] Plaintiffs, however, seek to embark on a broad fishing expedition into the documents of Salesforce's highest-level executives, including its CEO and founder, based only on titles, generalized public statements regarding AI, and speculation.[4] For example, based on the single factual allegation (pled on information and belief) relating to Agentforce, FACC ¶ 48, Plaintiffs seek the designation of three custodians—two of which are senior executives—for their purported personal knowledge of Agentforce. They provide no showing that any proposed custodian possesses unique, non-duplicative information relevant to LLMs or any decision at issue. Plaintiffs' effort to expand discovery up the corporate chain without such a showing is improper and their Motion should be denied in full.

Salesforce's eight custodians collectively cover every relevant aspect of the accused conduct and models. These custodians include the team leads and individuals responsible for dataset selection and processing, model pretraining, post-training, and evaluation, as well as the Senior Director responsible for any commercialization of the accused models. Salesforce's custodians also include

---

[3] Contrary to Plaintiffs' insinuation, Salesforce's size is not the appropriate metric to determine a proportionate number of custodians.

[4] This dispute is one of many efforts by Plaintiffs to expand discovery into a sprawling audit of Salesforce's entire AI-related business. Plaintiffs have also served nearly 100 RFPs and requested Salesforce run roughly 2,500 search terms broadly covering everything related to AI.

its Executive VP and Chief Scientist at Salesforce AI Research,[5] to whom the team leads and Senior Director reported and who oversaw the development, commercialization (to the extent there was any), and any copyright issues that may have arisen with the relevant LLMs. Salesforce's investigation confirms that the current custodians *are* the relevant individuals with decision-making authority regarding data acquisition and business development of the accused models. Plaintiffs identify no gap in that coverage.

"The burden is on Plaintiffs" to show the proposed custodians possess unique, non-duplicative information unavailable from existing custodians. *In re Facebook*, 2021 WL 10282213, at \*2; *see Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-cv-02946, 2023 WL 5507176, at \*3 (N.D. Cal. Aug. 25, 2023) (declining to add executive where plaintiff failed to show he possessed information unavailable from other custodians); *Handloser v. HCL Am., Inc.*, No. 19-cv-01242, 2020 WL 7405686, at \*2 (N.D. Cal. Dec. 17, 2020) (same). Plaintiffs cannot satisfy this burden by gesturing at titles and LinkedIn profiles.

Nor does the fact that courts have permitted larger custodian counts in other cases establish that additional custodians are warranted here. In *Tremblay*, the dispute concerned multiple generations of models powering defendants' flagship commercial products and involved a broader range of claims than those presented here. *See Tremblay*, 2024 WL 3638421, at \*1.. In *Nazemian*, the dispute concerned a custodian cap rather than specific proposed custodians. *Nazemian*, ECF No. 98. And *Facebook* involved dozens of claims and a different factual record concerning Facebook's core platform. None of those cases suggests that additional custodians should be added, where the existing custodians already cover the relevant subject matter.Finally, Plaintiffs' methodology of proposing custodians based on a review of Salesforce's website and LinkedIn profiles is precisely the kind of speculative, top-down approach that Rule 26(b)(1)'s proportionality framework is designed to foreclose.

**1-4. *Marc Benioff, Steve Fisher, Srini Tallapragada, and Jayesh Govindarajan***: Plaintiffs' arguments as to these proposed custodians rest on the same premise—each occupies a senior leadership role and has made public statements regarding AI generally. But Plaintiffs must show the proposed custodian is likely to possess unique, non-duplicative information unavailable from existing custodians. *Facebook*, 2021 WL 10282213, at \*2. Plaintiffs make no such showing.

Benioff's remarks are observations about *other* companies' practices, not Salesforce's selection of data used to train the at-issue models. And Benioff's one response in an interview ("[w]e're not scraping the internet with our models, if that's your question") does not indicate that he has *personal, unique,* and non-duplicative knowledge about which LLMs were integrated into which products or the specifics about whether Salesforce's LLM training pipelines comply with copyright law. Likewise, Fisher's general AI-related comment ("AI is only as good as the data that it has") by no means suggests personal knowledge of the at-issue model or datasets. Plaintiffs' assumption that the CEO and CTO of "one of largest corporations" would be personally involved with and possess *unique* information about Salesforce's efforts concerning the at-issue models is unsupported and distinguishable from the circumstances underlying their cited authority. *See, e.g.*, *Tremblay*, 2024 WL 4512055, at \*2–3 (COO selected as one of parties' agreed 24 custodians because discovery showed he "regularly interfaces with . . . prospective training data licensors"); *Facebook*, 2021 WL 10282213, at \*2 (executives added where a *produced email* showed the

---

[5] *See* https://www.salesforce.com/blog/author/silvio-savarese/. Plaintiffs are incorrect that there are no "executive level" custodians.

CEO's personal "high-level decision making and execution of a plan"). Similarly, Tallapragada's comment that "AI requires data" and that this "AI revolution . . . comes with its own challenges for developers" are yet again basic concepts about AI generally. Further, Plaintiffs' reference to the "AI at Salesforce" chat is pulled from an article discussing a potential *future* product that has nothing to do with the at-issue models, datasets, or factual allegations in the FACC. At most, these statements reflect high-level corporate messaging or generalized industry commentary; they do not show that any of these executives personally participated in selecting the accused datasets, training the accused models, or making the specific decisions relevant to Plaintiffs' claim.

Nor is there any gap requiring these executives. The existing custodians include the individuals directly responsible for dataset selection, preprocessing, training, evaluation, and any product-related work or commercialization of the accused models. Plaintiffs' request would add, at most, duplicative custodians whose knowledge necessarily derives from the teams already in the custodian pool. *Roblox Corp.*, 2023 WL 5507176, at *3; *Handloser*, 2020 WL 7405686, at *2.

**5. _Tuhin Chakrabarty_**: Plaintiffs' argument concerning Chakrabarty is based entirely on his academic research concerning LLMs generally, not on any identified involvement with the accused models or datasets. Plaintiffs do not identify a single fact connecting Chakrabarty's cited publications to the accused models or the accused conduct. The academic commentary that Plaintiffs cite as support for his unique knowledge are neither associated with Salesforce nor about Salesforce's actions or models. Plaintiffs' suggestion that he may have tested whether Salesforce models could reproduce copyrighted works is more unsupported speculation. Even assuming Chakrabarty possesses some relevant information, Plaintiffs offer no basis to conclude that such information would be unique or unavailable from the Salesforce researchers and engineers who actually developed and trained the accused models. Indeed, Plaintiffs' own point—that he co-published with another agreed-to custodian—confirms the opposite of uniqueness.

**6. _Vivek Mahapatra_**: Plaintiffs rely on his role relating to Agentforce but identify no evidence that the accused models were used in connection with Agentforce or that his work involved the accused models. A generalized theory of commercialization or executive oversight does not justify adding further senior executives where Plaintiffs have not tied them to the accused datasets, models, or challenged conduct. And Plaintiffs' single conclusory allegation that Salesforce integrated accused models into Agentforce products does not permit unbounded discovery into Agentforce. Plaintiffs also fail to explain why any relevant information he may possess would not already be available from existing custodians, including the leaders responsible for the development of the accused models and any associated commercialization efforts. Nor does *Andersen* help Plaintiffs: the court allowed the additional custodian because, "*unlike the other designated custodians*," he "worked in product marketing and artist relations." *Andersen*, 2026 WL 1257935, at *3 (emphasis added).

**7. _Kathy Baxter:_** Baxter's responsibilities broadly concern AI governance, policy, ethics, and compliance. Plaintiffs identify no evidence that she participated in selecting or approving training data, trained the accused models, or made decisions regarding the datasets at issue. Instead, Plaintiffs rely on her policy-oriented role and public statements about responsible AI and data selection generally. This does not establish possession of unique, non-duplicative information concerning the specific conduct challenged in this case. And to the extent copyright compliance, licensing considerations, or AI governance issues are relevant, Plaintiffs have not shown why such information would uniquely reside with Baxter rather than with the existing custodians responsible for developing and overseeing the accused models.

Dated: June 17, 2026

Respectfully submitted,

By: */s/ Joseph C. Gratz*

By: */s/ Lesley E. Weaver*

Joseph C. Gratz (CA SBN 240676)
JGratz@mofo.com
Tiffany Cheung (CA SBN 211497)
TCheung@mofo.com
**MORRISON & FOERSTER LLP**
425 Market Street,
San Francisco, California  94105-2482
Telephone:      415.268.7000
Facsimile:      415.268.7522

Christian W. Marcelo (WA Bar No. 51193)
(*pro hac vice*)
CMarcelo@mofo.com
**MORRISON & FOERSTER LLP**
925 Fourth Avenue, Floor 38
Seattle, WA 98104
Telephone:      206.327.6500

Sara Talebian (DC Bar No. 1779112)
(*pro hac vice*)
STalebian@mofo.com
**MORRISON & FOERSTER LLP**
2100 L Street, NW Suite 900
Washington, D.C.  20037
Telephone:      202.887.1500

*Attorneys for Defendant*
Salesforce, Inc.

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
**STRANCH, JENNINGS & GARVEY, PLLC**
1111 Broadway, Suite 300
Oakland, CA 94607
Tel. (341) 217-0550
Email: lweaver@stranchlaw.com
adavis@stranchlaw.com
jsamra@stranchlaw.com

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (SBN 202724)
Andrew Fuller (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice* to be filed)
Ellen J. Wen (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
1809 7th Ave., Ste. 1610
Seattle, WA 98101
Tel: (206) 802-1272
Email: kswope@cpmlegal.com
tloeser@cpmlegal.com
afuller@cpmlegal.com
jalhadeff@cpmlegal.com
ewen@cpmlegal.com

Joseph R. Saveri (SBN 130064)
Christopher K.L. Young (SBN 318371)
William W. Castillo Guardado (SBN 294159)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
wcastillo@saverilawfirm.com

Avery M. Wolff (*pro hac vice*)
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017

6

Telephone: (347) 790-0069
Facsimile:  (347) 790-0029
Email: awolff@saverilawfirm.com

*Attorneys for Individual and Representative*
*Plaintiffs E. Molly Tanzer, Jennifer Gilmore,*
*Tasha Alexander, Jon McGoran, and Art Kleiner*

7

## **E-FILING ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

*/s/ Lesley E. Weaver*
Lesley E. Weaver

8